[No. B007262. Second Dist., Div. Seven. July 23, 1986.]

In re THOMAS C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
THOMAS C., Defendant and Appellant.

**COUNSEL**

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff and Henry J. Hall, Deputy Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Mark Alan Hart and Alison Braun, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.**—Minor, Thomas C., appeals from the order of the juvenile court adjudicating him a ward of the court (Welf. & Inst. Code, § 602) for committing murder in violation of Penal Code section 187. Minor contends that (1) the evidence supports only a finding of voluntary manslaughter, not murder, and (2) the sustained murder charge should be reduced to manslaughter under the "'proportionality review' mandated by *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]."

The evidence, viewed in the light most favorable to the judgment (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), establishes that minor, a clinically depressed 16-year-old, shot and killed his 14-year-old sister, Jody, at her request on February 1, 1983. About a week or two before the tragic killing, minor and Jody, who were very close, ran away together into the hills above Burbank, taking with them food, clothing and camping gear from the family home. After their return, their father, Mr. C., took away their keys to the main house, placed both minor and Jody in the bedroom over the detached garage, which had previously been Jody's, and denied them access to the main house unless their father, stepmother or stepbrother was present. As punishment, the father also took away minor's driver's permit.

On January 31, the day before the killing, minor, Jody and the father went to the police station at the request of the police, for a postrunaway follow-up interview where they talked with Detective Holm. According to Holm, minor was quiet, withdrawn and appeared depressed. The father also felt minor was quite depressed as he had been for some months prior to that. Although Jody seemed to be just quiet, not seriously depressed to the father, Officer Holm thought she also appeared to be depressed. She told Holm she was despondent about having no close friends.

On February 1, both Mr. and Mrs. C. saw Jody for the last time alive when she was preparing for school before they left for work. When Mr. C. returned that evening, minor met him at the driveway. Minor was very upset, indicated concern that they had been burglarized and insisted that the father should call the police. A burglary was reported to the police after Mr. and Mrs. C. discovered that the parents' locked bedroom door had been kicked open and several items were missing, including a credit card, cash, minor's

driver's license, minor's .22 rifle which his father had taken from him, the keys to the van, and Mrs. C's .38 handgun. The patio and stairway were wet and minor said that he had cleaned them because they had been muddy.

When Mr. C. realized that Jody was not home, he became concerned. Her clothes were still in the bedroom over the garage but her yellow electric blanket was missing. Minor told him she had gone to see friends. Mr. C. checked the yard at about 8:30 p.m. but it was dark and was raining heavily and he could not see anything. The following day, February 2, Mrs. C. checked with the school which reported Jody had been there all day February 1 but was not there that day. That evening, Mr. C. made a runaway report.

On the morning of February 4, Jody's body in her blanket, buried in the yard, was found by Mrs. C. when she scraped some dirt away from an eight-inch mound of dirt, apparently freshly dug.

After the police were called, Officer Holm interviewed the minor. Minor at first told Holm he had been in Santa Monica on February 1. But after Holm told him that there was information linking him to Jody's death, minor said he had lied about the Santa Monica trip and confessed to killing Jody.

According to minor's statements to the police, which were admitted in evidence during the People's case-in-chief, minor burglarized the family home that day, February 1, to get several items, including a .38 caliber revolver, his .22 rifle, his driver's license, a credit card, cash, and two suitcases because he had decided to run away from home. He took the two suitcases to the bedroom over the garage he then shared with Jody, packed his clothes and lay in the bedroom the entire afternoon trying to decide what to do.

When Jody came home, they went for a snack in the family house and then returned to their bedroom, sat on the bed and began to talk. She apparently was very despondent and asked him to help her commit suicide. She picked up the handgun from the bed, asked if it was loaded and indicated she wanted him to kill her. She stood up, went over to the stereo to turn it up which he felt was going to muffle the shot somewhat. She then walked over to the corner. He then picked up the handgun and walked over to her. The minor told her he did not want to do it but she again reassured him that was what she wanted. At this time, he directed the weapon at the back of her neck or head area. She told him "'I will count to three and then you shoot.'" At the count of three, he started to pull the trigger and was very

surprised afterwards that he did it. He claimed that he "'[b]arely pulled the trigger [and] was hoping it wouldn't work.'" Afterwards, there was blood everywhere and he tried to talk to her.

Minor then wrapped her in the yellow blanket, took her down to the yard by the trees and poured a little dirt on her. He did not finish burying her in the shallow grave until a few days later because there was always someone around the house.

During the interviews with the officers, minor seemed withdrawn and then was emotionally distraught and sobbing when telling Holm about the shooting.[1]

Bloodstained clothes and a blanket were found in the bedroom which minor and Jody shared, and part of the carpet was saturated with blood; bloodstained towels and wash cloths were found in a downstairs bathroom cabinet; and minor's bloodstained tennis shoes were retrieved from his school locker. The fully loaded handgun with which he shot Jody was found in a bag of planter mix in the garage shed where he had admitted hiding it, and his .22 rifle was found in some ivy next to the fence.

On March 8, Dr. Spencer Eth, a U.S.C. child psychiatrist, conducted a one-hour interview of minor at the request of minor's counsel who wanted a treatment diagnosis and recommendation. Eth, who testified for the minor, diagnosed minor as suffering at the time of the interview from a major depression with melancholia, with impaired judgment, as well as posttraumatic stress disorder, complicated by possible drug and alcohol abuse. Eth recommended psychiatric hospitalization. Since he did not examine minor until five weeks after the shooting and minor did not tell him about the shooting during the interview, he could only make an educated inference that minor was depressed at that time, based on minor's history which showed long periods of depression. Eth felt minor's prior suicide attempts, shooting his sister and impulsive behavior, such as frequent moves, were indicative of a lowered threshold for violence. He believed treatment was urgently needed because minor's illness had life-threatening consequences.[2]

---

[1]Minor said that Jody "didn't deserve to die"; he "didn't know . . . it would be like this . . . [h]er blood was everywhere" and he "had [his] baby sister's blood on [his] hands." He also repeatedly stated: "You know, she begged me to kill her. I didn't want to. I loved her so."

[2]According to Eth, symptoms of major depression include slow movement, sleep disturbance, poor appetite, social withdrawal, difficulty in concentrating, low self-esteem and self-worth, anhedonia (inability to feel pleasure) and suicidal ideation.

Eth found what he considered the equivalent of suicidal ideation in minor's expressed desire to be convicted of murder and lack of care about what punishment he received. Minor's history showed two prior suicide attempts and at least two other runaways. His family history included severe depression in his mother and manic depressive illness in his father.

Dr. Mark Leveaux, a fourth-year resident in psychiatry, treated the minor at Los Angeles County Hospital Adolescent Crisis Unit, from April 1 until April 29, 1983. Leveaux testified he diagnosed minor as suffering from major depression, based on minor's history as reported by minor and his father, minor's prior treatment for depression, a positive dexamethasone suppression test, minor's family history of father's manic-depressive illness and Jody's depressive illness, minor's current symptoms of depressed speech affect, and psychological testing. Leveaux felt it was a reasonable inference that the minor's current depressive episode began in the fall of 1982.

The court, indicating its concern with "the quality of decision-making during the depressive episode," specifically queried Leveaux about his opinion of minor's "appreciation of the life-threatening act of placing a gun up to his sister's neck or head," assuming for the purposes of the court's question "that there was a continuous depressive episode in the fall of 1982 until [Leveaux] saw him in 1983, and during the time that he killed his sister." Leveaux answered that minor might not have been thinking clearly about the future implications of his behavior. Leveaux thought, however, that minor's "impulsivity [indicated] a lack of regard for consequences . . . . [r]ather than a lack of awareness."

With respect to the court's specific question regarding minor's appreciation of the "life-threatening act of raising a gun to a person," Leveaux stated that "there was no evidence that he had a psychotic illness in terms of seriously-disordered perceptions, reality or delusions, hallucinations or other things that might disconnect one's understanding of what one is doing [or] [i]n other words, what the consequences of what one is doing, the implications of what one is doing. So, I have no evidence on my examinations of Thomas that he was not aware that putting a gun to somebody's head might kill them."

Dr. Gillick, a forensic psychiatrist, had interviewed minor on March 17, had interviewed the stepmother, and had reviewed other reports, including a document showing minor received psychiatric treatment and medication in Arizona for depression in 1981. Gillick testified for the defense that minor, because of his severe depression at the time of the offense, lacked capacity to and did not harbor malice aforethought. According to Gillick, minor was planning to run away to Colorado to his pregnant girlfriend's to see if they could get together and felt guilty about leaving Jody, and Jody "boxed him in" by saying that he should help her commit suicide because she had helped him in a prior suicidal attempt.

The trial court found that minor was clinically depressed but did harbor express malice aforethought, and sustained a second degree murder conviction.[3]

## DISCUSSION

### I

### Sufficiency of the Evidence

Substantial evidence supports the trial court's finding that minor committed second degree murder. ■ The test on appeal is whether, viewing all of the evidence in the light most favorable to the judgment, the evidence is sufficient to support a rational trier of fact finding beyond a reasonable doubt that minor committed the offense. (*People* v. *Johnson, supra,* 26 Cal.3d at p. 576.) ■ In order to convict a person of second degree murder, the prosecution must prove not only that the person committed the fatal act but that he did so with "malice aforethought." (*People* v. *Love*

---

[3]The court stated:

"There has been no evidence in this case of a suicide pact.

" . . . .

"There has been direct evidence of malice. The question before the Court from the evidence is not one of implied malice where the phrase abandoning malignant heart has application, but is, instead, a concern with whether Thomas' act, Thomas' act constitutes the malice that makes murder a murder of the first degree—I am sorry—or of the second degree as distinguished from manslaughter.

"This Court finds from the evidence that Thomas did suffer from a severe depression, a mental depression, and following the standard of Penal Code Section 28, the only question that remains then in applying that finding to the uncontradicted evidence that Thomas caused the death of his sister Jody, is to what degree did that clinically-recognized impairment interfere or preclude the formation of the state of mind that is called malice.

"In answering the question, cases turn to different facts. That it does seem there is a thread of distension even though the law recognizes that mental impairments can preclude some kind of state of mind, at the same time there is a concern and the tension between understanding a state of mind and its preclusion from the tension between that and accountability that causes us to focus on a cognitive process in determining whether malice exists.

"It seems to me that Thomas, from the evidence, that Thomas knew full well that placing a gun to Jody's head and pulling the trigger would cause her death. There is a cognitive process, a clear recognition whether there was malice also required in answer to the question whether there was moral perception and whether Thomas appreciated that act, and its quality as an antisocial act.

"I will find from the evidence that there is a substantial doubt of premeditation and deliberation and that the elements required for first-degree murder are not present, or have not been proved beyond a reasonable doubt, but Thomas' confused state of mind precluded that kind of reflective process.

"Malice of a less complex state of mind, less thoroughness, insight, if you will.

"For these reasons, the Court finds beyond a reasonable doubt after hearing the evidence, that it has been demonstrated beyond a reasonable doubt that Thomas entertained that state of mind characterized as malice at the time he acceded to Jody's request and killed her. I will find it true that Thomas committed the offense murder, that murder being in the second degree."

(1980) 111 Cal.App.3d 98, 105 [168 Cal.Rptr. 407]; see Pen. Code, § 187.) Minor contends that the People did not meet their burden to prove malice aforethought beyond a reasonable doubt. Minor claims that the trial court erroneously equated all intentional homicides to murder and there was no proof of malice aforethought. We disagree.

### A. *Malice Aforethought*

Penal Code section 188 defines malice aforethought as follows: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

The "malice aforethought" required for murder is an elusive concept which does not lend itself to a definitive and precise meaning. However, basically, every intentional killing is with malice aforethought unless the circumstances surrounding the killing are sufficient to constitute justification, excuse or mitigation; any intent to kill under other circumstances is considered malicious. (Perkins, Criminal Law (2d ed. 1969) § 1, p. 35.) Minor points out that even an intentional killing can be nonmalicious if prompted by adequate provocation (*People* v. *Borchers* (1958) 50 Cal.2d 321 [325 P.2d 97]) or committed by a person whose mental condition was such that he did not form malice aforethought (*People* v. *Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342]). But, "[n]ormally, an intentional killing is at least second degree murder. . . ." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311].)

While the burden is on the People to prove beyond a reasonable doubt each of the elements of the murder, including, for example, that the act which caused the death was not done in the heat of passion, the trier of fact may infer malice. Such an inference does not violate the mandate of *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068], and *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881]. As was explained in *People* v. *Love, supra,* 111 Cal.App.3d at page 109: "Although the word 'presumption' is used in many of the cases, what is truly meant is that a shorthand label—malice—may be given

to the actor's state of mind when his conduct reaches a certain antisocial level. The trier of fact, using a circumstantial-evidence-reasoning process involving the application of logic, draws a permissible inference of malice from the facts proved at trial. This permissible inference is different from and should be distinguished from a presumption which may relieve the People from satisfying its burden of proof. [Citations.]"

### B. *Finding of Express Malice*

■ The trial court herein specifically found express malice. Such a finding was proper. Once a defendant intends to kill, any malice he may harbor is necessarily express malice. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446].) As the judge stated, and minor concedes in his brief, the minor "knew full well that placing a gun to Jody's head and pulling the trigger would cause her death." Further, Dr. Leveaux's testimony indicated that minor was fully aware of, but lacked regard for, the consequences of his actions.

### 1. *Difference Between "Deliberate Intention" and "Premeditation and Deliberation"*

■ Minor, pointing to the statutory language of "deliberate intention" for express malice, claims that the experts' evidence shows that because of his illness and his sister's request, he could not and did not deliberately kill. Furthermore, he claims the judge's agreement with this is shown by his comments rejecting a finding of premeditation and deliberation for first degree murder.

Minor's reliance on the definition of "deliberate," in *People* v. *Thomas* (1945) 25 Cal.2d 880, 898-899 [156 P.2d 7], is misplaced, since the court therein was speaking of the use of the words "deliberate" and "deliberation" in the definition of first degree murder. The use of the term "deliberate intention" for malice aforethought, as required in second degree murder, is not synonymous with the term "deliberate," as used in defining first degree murder. (See *People* v. *Washington* (1976) 58 Cal.App.3d 620, 623-625 [130 Cal.Rptr. 96], where the court rejected a claim that the jury should have been instructed sua sponte that the killing must be deliberate as well as unlawful before express malice may be inferred from the commission of an intentional homicide.)

In *People* v. *Valentine* (1946) 28 Cal.2d 121 [169 P.2d 1], our Supreme Court pointed out that it was "incorrect [to differentiate] manslaughter from murder on the basis of *deliberate* intent . . . . Deliberate intent . . ∴ is not an essential element of murder, as such. It is an essential element of one

class only of first degree murder and is not at all an element of second degree murder." (*Id.*, at pp. 131-132; see also *People* v. *Atkins* (1975) 53 Cal.App.3d 348, 357 [125 Cal.Rptr. 855]; *People* v. *Goodman* (1970) 8 Cal.App.3d 705, 708-709 [87 Cal.Rptr. 665], disapproved on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441, 451-452 [99 Cal.Rptr. 313, 492 P.2d 1].) Indeed, the standard CALJIC instruction (No. 8.11 (1983 rev.)) has been held to be a correct definition of express malice aforethought, despite the fact that it does not use the word "deliberate" as used in Penal Code section 188, but merely states that "[m]alice is express when there is manifested an intention unlawfully to kill a human being." (CALJIC No. 8.11.) In short, "deliberate intention," as stated in Penal Code section 188, merely distinguishes "express" from "implied" malice, whereas premeditation and deliberation is one class of first degree murder.

The trial court could properly infer from the circumstances of the crime, further buttressed by Dr. Leveaux's testimony, that minor harbored express malice aforethought. The trial court was of course free to reject the testimony of defense expert Dr. Gillick to the contrary. (*People* v. *Memro* (1985) 38 Cal.3d 658, 701 [214 Cal.Rptr. 832, 700 P.2d 446].) ▮ Where experts are asked to speculate about an accused's state of mind at some time in the past, their opinions, even when unanimous, are not necessarily controlling. (*People* v. *Drew* (1978) 22 Cal.3d 333, 350-351 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Wolff* (1964) 61 Cal.2d 795, 810-811 [40 Cal.Rptr. 271, 394 P.2d 959].) Even when diminished capacity was still a defense,[4] the ultimate conclusion on diminished capacity was for the trier of fact to make since, strictly speaking, a psychiatrist is not an expert at all when it comes to determining if the accused is legally responsible under California law. (*People* v. *Cruz* (1980) 26 Cal.3d 233, 249 [162 Cal.Rptr. 1, 605 P.2d 830].) The ultimate issue to be decided is, after all, a legal issue, not a scientific one. (*People* v. *Jackson, supra,* 152 Cal.App.3d at p. 969.) Indeed, the Legislature has expressly determined that judges and lay jurors are capable of deciding whether a defendant's mental illness results in an inability to form the mental state legally required to sustain the charge. (*Ibid.*; see Pen. Code, § 29, providing that the ultimate determination must be made by the trier of fact.)

---

[4]The diminished capacity defense has been abolished in juvenile adjudications (Pen. Code, §§ 25, 28) as well as criminal trials (*Ibid.*; see also *People* y. *Whitler* (1985) 171 Cal.App.3d 337, 341 [214 Cal.Rptr. 610]; *People* v. *Lynn* (1984) 159 Cal.App.3d 715, 731 [206 Cal.Rptr. 181]; *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 967 [199 Cal.Rptr. 848].) The trial court recognized this since it specifically relied on Penal Code section 28. Gillick testified both that minor could not and did not harbor malice aforethought. However, the only issue, in view of the abolition of the diminished capacity, is really whether minor did harbor malice aforethought, not whether he could.

2. *Inapplicability of "Heat of Passion"*

 Minor's claim, that the evidence introduced at the jurisdictional hearing proved only a violation of Penal Code section 192, voluntary manslaughter, because he acted solely out of passion, lacks merit. Initially we note that contrary to the meaning of the word "malice" in ordinary conversation, "[t]he mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim." (*People v. Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911]; *People v. Love, supra,* 111 Cal.App.3d at p. 105.)

 Furthermore, we cannot say, as a matter of law, that the facts established voluntary manslaughter on the theory of heat of passion. Heat of passion involves both objective and subjective elements. (*People v. Wickersham, supra,* 32 Cal.3d at pp. 326-327.)

Minor may well qualify for the subjective element of the heat of passion test, that the actor be under the actual influence of a strong passion at the time of the homicide. As our Supreme Court pointed out in *People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777], and *People v. Borchers, supra,* 50 Cal.2d 321, 329, relied on by minor, the "passion" in the statute defining manslaughter "need not mean 'rage' or 'anger' but may be any '[v]iolent, intense, high-wrought or enthusiastic emotion' . . . ." (*People v. Berry, supra,* at p. 515.)

Nonetheless, the objective or reasonable person element of sufficient provocation has not been met. Minor's depressed mental state cannot be the provocation since the provocation must be from the victim. (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 125-126 [202 Cal.Rptr. 663].)

Moreover, as our Supreme Court explained in *People v. Wickersham, supra,* 32 Cal.3d at page 326: " " "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and . . . consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless . . . the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man . . . . For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render *ordinary men of average disposition* liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." " " " (Italics added.) We conclude that minor's clinical depression is not the ordinary man's average disposition.

### 3. *Inapplicability of Suicide Pact Exception*

 Minor further argues that "[a]ctive assistance in the commission of suicide is not necessarily murder by operation of law." Minor contends that "under the law of homicide as it currently exists he lacked malice aforethought and is responsible for manslaughter rather than murder" as a matter of law because his conduct consisted only of actively assisting a suicide.

 Suicide is not a crime in California, but assisting a suicide is. California has created "a sui generis crime of aiding and abetting suicide. [Fn. omitted.]" (*In re Joseph G.* (1983) 34 Cal.3d 429, 434 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690].) The California aiding statute, in effect since 1873, provides simply: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." (Pen. Code, § 401.)

As minor points out, the California Supreme Court has addressed the issue of the legal culpability of an individual who assists another in the commission of suicide in two cases: *People* v. *Matlock* (1959) 51 Cal.2d 682 [339 P.2d 505, 71 A.L.R.2d 605], and *In re Joseph G., supra,* 34 Cal.3d 429. In both these cases, the accused was convicted of murder but claimed that he was liable only under Penal Code section 401. In *Matlock,* the defendant, who was convicted of robbery and murder, admitted strangling the victim but asserted that he did so only at the victim's insistence and request. The Supreme Court held that section 401 was not applicable. It explained that where a person actually performs or actively assists in performing the overt act resulting in death, his act constitutes murder. In this circumstance it is immaterial whether this act is committed pursuant to an agreement with the victim.

Recently, however, in *In re Joseph G., supra,* 34 Cal.3d 429, our Supreme Court carved out an exception to that rule. In *In re Joseph G.,* in juvenile wardship proceedings a minor, who was a survivor of a suicide pact, was charged with murder and with aiding and abetting a suicide. Pursuant to the pact, the minor and a companion had driven a car over a cliff. The minor who was the driver survived, while the companion was killed. The trial court sustained the wardship petition as to the murder count and found it was in the first degree but dismissed the aiding and abetting charges as inapplicable.

The Supreme Court reversed. The court held that the broad rationale for holding the survivor of a suicide pact guilty of murder was inappropriate in the limited situation therein. It held that aiding and abetting under the

suicide statute, rather than murder, is the proper criminal liability to be attached to a survivor of a mutual suicide pact in which one party provides the means but each individual kills himself pursuant to the agreement or in which the pact envisions both parties killing themselves simultaneously with a single instrumentality. The court pointed out: "Although such individuals are thus not totally lacking in blameworthiness, their criminal responsibility would appear to fall far short of the culpability of one who actively kills another at the request of the victim. . . ." (*Id.,* at p. 438.) The exception to the active/passive distinction of *Matlock* applies to the genuine suicide pact situation in which the suicides are undertaken simultaneously by a single instrumentality. (*Id.,* at p. 440.) The Supreme Court noted that the trial judge had found that there was a true mutual suicide pact which was freely entered into and not induced by force, duress or deception; the suicide and the attempted suicide were committed simultaneously by the same act; and the potential consequences for both the driver and the passenger were identical, thus obviating the danger of fraud. (*Id.,* at pp. 438-439.)

Unlike *Joseph G.,* there was no mutual suicide pact here. Nor was there an instrumentality for a simultaneous death. There was the chance of fraud. As in *Matlock,* our situation herein does "not involve a suicide pact but instead deal[s] with a more straightforward situation in which a suicide victim is killed as a result of direct injury that the defendant inflicts on him." (*Id.,* at p. 436.) Minor is, of course, not asking to be liable merely for a charge of aiding and abetting a suicide under Penal Code section 401. Minor instead claims that he should be liable under the facts herein for voluntary manslaughter. In *In re Joseph G., supra,* our Supreme Court stated that the current law in California provides no option except finding one who unsuccessfully attempts suicide by means of a mutual suicide pact to be liable for murder at one extreme, or at the other only for aiding and abetting a suicide. (*Id.,* at p. 438.) Since minor does not qualify for the limited exception set forth in *In re Joseph G.,* the current law in California provides that, like the defendant in *Matlock,* he is liable for murder.

Accordingly, the second degree murder charge was properly sustained.

## II

### REDUCTION OF OFFENSE UNDER DILLON

 Minor further contends that the sustained murder charge herein should be reduced to voluntary manslaughter under *People* v. *Dillon, supra,* 34 Cal.3d 441. In *Dillon,* the defendant was a minor, certified for prosecution in the criminal court, who, while attempting a robbery, killed the victim out of panic when the latter approached him with a gun. The Supreme Court,

while upholding the constitutionality of the felony murder rule, held that the punishment for first degree murder was cruel and unusual as applied in *Dillon*. The court applied an analysis developed in *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], to determine whether Dillon's punishment was "grossly disproportionate" to his individual culpability. (34 Cal.3d at pp. 478-480.)

Minor contends that such a weighing as in *Dillon* cries out for a reduction to voluntary manslaughter in the case at bench where the minor's actions were not for personal gain. Rather, he contends that, under the facts presented to the court, he acted solely because of his mental illness and at the request of a sister whom he loved. Minor compares his culpability with that of the minor in *In re Joseph G.*, and the defendant in *Matlock*, where both also involved aiding a suicide. Minor admits that the minor in *In re Joseph* was less culpable in the sense that both he and his companion engaged in the fatal act together but notes that the minor in *In re Joseph* did not appear to have the deep-seated mental illness that he had. Minor further contrasts his culpability with that of the minor in *Matlock* who engaged in the suicide for profit and was not suffering from any mental depression.

The People argue that minor's Youth Authority commitment cannot be deemed cruel and unusual punishment. The People cite to the rule that the cruel and unusual punishment provisions of the California and United States Constitutions do not apply to Youth Authority commitments because such commitments are solely for the purpose of rehabilitation and not punishment. (*People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]; *In re Gary W.* (1971) 5 Cal.3d 296 [96 Cal.Rptr. 1, 486 P.2d 1201]; *In re Richard W.* (1979) 91 Cal.App.3d 960 [155 Cal.Rptr. 11].) The People argue that a proportionality analysis therefor is not possible in juvenile cases. We question the continuing validity of this purported rule.

*Gary W.*, dealt not with initial (Welf. & Inst. Code, § 602) commitments to Youth Authority, such as the one before us here, but with extensions of the initial commitment pursuant to Welfare and Institutions Code sections 1800-1803, because of physical or mental defects. (See *People* v. *Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373].) While *Gary W.* held that the latter type of commitment does not constitute cruel and unusual punishment if accompanied by adequate treatment, the case did not discuss the application of cruel and unusual punishment principles to initial commitments.

More significantly, *People* v. *Olivas, supra*, 17 Cal.3d 236, can be read to indicate that the question before us is an open one. *Olivas* broke with previous authority and held that the length of commitments to Youth Au-

thority may in some instances violate the constitutional guarantee of equal protection. The *Olivas* court rejected the People's argument that the rehabilitative, rather than punitive, purpose of Youth Authority justifies the confinement of Youth Authority wards for periods longer than those imposed on similarly situated defendants sentenced to state prison. The court reasoned that the rehabilitative purpose of Youth Authority did not save Olivas' commitment from constitutional attack since the disparate length of his commitment was not shown necessary to achieve his rehabilitation.

*Olivas* declined to reach the further question whether the defendant's Youth Authority commitment violated the state and federal prohibitions of cruel and unusual punishment. The court noted, however, that if it were to adhere to its previous holding, that cruel and unusual punishment provisions are inapplicable to Youth Authority commitments, citing *Gary W.,* and if it were also to adhere to its previous holding that the equal protection provisions are similarly inapplicable, then nothing could stop the Legislature from allowing marginally incorrigible youths to be committed to Youth Authority for decades or for life under the guise of rehabilitation.

By its unprecedented application of equal protection analysis to Youth Authority commitments, the court in *Olivas* indicated that the traditional notions, that such commitments are impervious to constitutional challenge as excessive punishment, may now also be open to dispute. Further, although the court in passing cited *Gary W.* as a decision which proscribed the application of cruel and unusual punishment principles to Youth Authority Commitments, *Gary W.* actually addressed only the narrow issue of Welfare and Institutions Code section 1800-1803 commitments.

We need not, however, decide the issue of whether proportionality analysis of *Dillon* is applicable to a juvenile case. We do not consider the instant appeal the appropriate proceeding for such an analysis at this time.

On direct appeal from a Youth Authority commitment, the appellate court has no knowledge of the actual term that a minor will serve for his offense. The juvenile court does not set the actual length of Youth Authority commitments. The maximum period of physical confinements for Youth Authority is governed by the longest period of confinement possible for an adult convicted of the same offense (Welf. & Inst. Code, § 726, subd. (c).) But, when such maximum period, as here, is lengthier than the ceilings set by Welfare and Institutions Code section 1769, the latter governs.[5]

---

[5]Since minor was found to have committed murder, Welfare and Institutions Code section 1769, subdivision (b), governs his commitment. That section provides: "(b) Every person committed to the Department of the Youth Authority by a juvenile court who has been found to be a person described in Section 602 by reason of the violation of any of the offenses

The Youthful Offender Parole Board sets the actual length of a minor's confinement in Youth Authority after the minor has been received. (*In re James V.* (1979) 90 Cal.App.3d 300 [153 Cal.Rptr. 334]; Welf. & Inst. Code, §§ 1765, 1766.) The parole consideration date is established for each ward in an initial hearing before the Youthful Offender Parole Board but that date "is not a fixed term or sentence, nor is it a fixed parole release date." (Cal. Admin. Code, tit. 15, § 4945, subd. (a).) Because the Youth Authority is required to consider all wards for parole on an annual basis, the parole consideration date is merely an additional review of parole readiness based on the ward's projected rehabilitation progress. (1 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) § 10.13, p. 287.) Welfare and Institutions Code sections 1765 and 1766 require the Youthful Offender Parole Board to maintain a continuous study of the person under its control, determine when parole will be granted and discharge the person as soon as, in its opinion, there is reasonable probability that he or she can be given full liberty without danger to the public.

Minor argues that the committing offense does in fact determine when a minor is released every bit as much as with an adult sentenced to prison. The Youthful Offender Parole Board has established seven categories of offenses that reflect its view of the seriousness of specific commitment sentences and the degree of danger posed to the public by those committed to the Youth Authority. (See 1 Cal. Juvenile Court Practice, *supra,* § 10.14, at p. 288.) Minor points out that although the board has the power to deviate from the suggested parole consideration date intervals, it usually applies the suggested term. (*Id.*, § 10.15, p. 293.) Assuming that it is as minor claims and the guidelines for second degree murder would be followed, minor's presumptive release date for a category one offense of second degree murder would be six years (Cal. Admin. Code, tit. 15, § 4951; 1 Cal. Juvenile Court Practice (Cont.Ed.Bar Supp. Mar. 1986) § 10.14, p. 119.) We cannot say that, as a matter of law, six years would be cruel and unusual punishment and disproportionate for a seriously clinically depressed minor who killed his younger sister.

It cannot be contested that minor, who has been suffering clinical depressive episodes since age seven, is in dire need of long-range treatment.

listed in subdivision (b) of Section 707, shall be discharged upon the expiration of a two-year period of control or when the person reaches his or her 25th birthday, whichever occurs later, unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800)."

Section 1800 relates to extended commitments, based not upon circumstances of the underlying offense, but upon a subsequent finding of physical danger to the public because of a mental or physical deficiency disorder or abnormality. (*In re John R.* (1981) 116 Cal.App.3d 940, 945, fn. 5 [172 Cal.Rptr. 387].)

Had minor been found to have committed voluntary manslaughter, section 1769, subdivision (a), with an age 21 maximum, would govern.

The psychiatrists who testified for the defense indicated that defendant had a lower threshold for violence, and pointed to his suicidal ideation and his impaired judgment. He suffers from major depression and his depressive episodes apparently have become longer in duration and more severe as he has grown older. He has a history of two prior suicidal attempts and thus has shown a self-destructive impulse, as well as destructive impulse towards others. And he comes from a family that also has a history of depression and manic depressive illness.

In March 1984, in its first disposition after sustaining the murder charge, the juvenile court originally ordered that minor should be allowed to voluntarily commit himself to the UCLA neuropsychiatric program pursuant to Welfare and Institutions Code section 6552, and the matter was continued for further disposition. However, that treatment program fell through. Thomas was then ordered suitably placed at Camarillo State Hospital. The Department of Mental Health, however, refused to fund Thomas' commitment to Camarillo. Local options having been exhausted, Thomas was then committed to the Youth Authority where he remains.

We note that the Youth Authority does at least have special treatment programs. The Northern California Reception Center-Clinic (NRCC) in Sacramento houses a 40-bed intensive counseling and educational program for emotionally disturbed juvenile court wards. The Southern California Reception Center-Clinic also houses a 40-bed intensive treatment unit for severely emotionally and behaviorally disturbed wards. (See 1 Cal. Juvenile Court Practice, *supra,* § 10.3, p. 276.)

The NRCC program has a waiting list generally for this unit and admission is limited to wards who want to go there. (*Ibid.*)[6] While there may be better programs in the private sector, we certainly cannot say that commitment for a long-term program such as this is cruel and unusual punishment. If we were to reduce the charge to manslaughter, minor would have to be released next year, as he would be 21 years old. (See Welf. & Inst. Code, § 1769, subd. (a); 707, subd. (a).) It may be that minor needs more treatment.

If, after the 21-year-old jurisdictional maximum for a juvenile committed for manslaughter has expired, and minor does not need or is not receiving

---

[6]According to the Youth Authority's program description, the NRCC WINTU intensive treatment program is designed for individuals with particularly severe emotional and behavioral disorders who require a full range of psychiatric services. Residents attend at least three small group therapy sessions and two large group community meetings each week. Counselor caseloads are no more than four, and each counselor is assisted by a miniteam composed of a psychologist, social worker and registered nurse.

such treatment, he can then attack the commitment by filing a writ of habeas corpus. (Cf., *People* v. *Wingo* (1975) 14 Cal.3d 169, 183 [121 Cal.Rptr. 97, 534 P.2d 1001].)

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.