Filed 9/20/16  P. v. Velasco CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B265036 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. KA099376) |
| CARLOS ELOI VELASCO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Thomas C. Falls, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found appellant Carlos Eloi Velasco guilty of the following: second degree murder (Pen. Code, § 187, subd. (a), count 1);[1] possession of a firearm by a felon (§ 29800, subd. (a)(1), count 3); two counts of resisting an executive officer (§ 69, counts 4 & 7); driving under the influence of drugs or alcohol (Veh. Code, § 23152, subd. (a), count 5); and battery on a custodial officer (§ 243.1, count 6). The jury found true the firearm enhancement on count 1.[2] Appellant was sentenced to state prison for a total of 42 years to life as follows: on count 1, 15 years to life plus a consecutive term of 25 years to life for the firearm enhancement; on count 4, a consecutive term of two years; and on counts 6 and 7, two terms of two years to run concurrently with the other terms. An eight-month term on count 3 was imposed and stayed, and appellant was given credit for time served on count 5.

Appellant contends the trial court erred and violated his constitutional rights by (1) failing to sua sponte instruct the jury on certain lesser included manslaughter offenses, (2) giving certain self-defense instructions, and (3) engaging in prejudicial misconduct, along with the prosecutor. We affirm.

## FACTS

**Prosecution Case**

In August 2012, 50-year-old Chuy Jose Flores (Flores) lived alone in the back house of residential property in South El Monte, California. Gilbert Ortiz (Ortiz) lived in the front house on the same property. On the afternoon of August 12, 2012, Flores and Ortiz were drinking beer in the backyard of the property, when appellant jumped over a cinderblock wall and asked for some oranges from a tree in the backyard. Flores told appellant he could have some oranges, but next time to come to his front door instead of jumping over the wall. Appellant picked some oranges from the tree and jumped back over the wall.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The jury found appellant not guilty of burglary in count 2.

Directly behind the property where Flores and Ortiz lived, there was a residential property with two houses, as well. Vilma Moreno (Moreno) and her cousin, Veronica Morazam (Morazam), lived in the front house and appellant lived in the back house. On August 12, 2012, Morazam was in the backyard pool area with her children when she saw appellant jump over the wall at the back of the property into the neighbor's yard. About an half hour later, appellant jumped back over the wall, holding some oranges. Moreno also saw appellant in her backyard pool area the same day, walking around in an agitated state, as if he were "drugged up." Later that evening, Moreno heard loud music coming from appellant's house until about 10:30 or 11:00 p.m. When the music stopped, Moreno saw appellant leave on his motorcycle.

At around 4:00 a.m. on August 13, 2012, Francisco Miranda (Miranda), a night watchman at a storage yard located across the street from a mechanic's shop where appellant worked, heard a loud crash. Outside, Miranda saw that appellant's truck had crashed into a wrought iron gate across the street. Appellant appeared to be intoxicated and accused Miranda of stealing his truck. Miranda called the police.

When the police arrived, appellant was starting to drive away. The police made a traffic stop and ordered appellant out of his truck. Appellant eventually got out and asked why he was being stopped. When one of the officers ordered appellant to move to the sidewalk, appellant became combative and a fight ensued between appellant and two officers. Appellant was eventually subdued and arrested. A search of appellant's truck yielded a nine-millimeter Glock handgun with a spent casing in the chamber. The gun appeared to have blood on it.

Appellant was taken to the jail ward at the Los Angeles County USC Medical Center, where he was treated for a laceration on his right hand that was present before his altercation with the police. When a security officer attempted to rehandcuff appellant after appellant was done being treated, appellant punched the officer in the nose.

On the afternoon of August 13, 2012, Flores's son David went to his father's house to visit. Once inside, David noticed the house looked cluttered and the television

3

was on.  David found his father lying on his stomach on a stair leading to the bedroom, with his head in a puddle of blood.

Flores died as the result of a single gunshot wound.  The bullet entered the right side of his nose from an approximate distance of 6 to 30 inches.  There was no exit wound, and Flores's body had no defensive wounds.  A bullet fragment removed from Flores's head was examined by a firearms expert and found to have rifling marks consistent with a Glock handgun and three other types of handguns that produce similar rifling characteristics.

DNA extracted from blood on the gun found in appellant's truck was compared to DNA extracted from reference samples taken from appellant and Flores.  Appellant's DNA profile matched one of two DNA profiles found on the barrel of the gun, as well as the DNA profile found in blood samples taken from the trigger, magazine, and gun grip. Flores's DNA profile matched that of the second DNA profile found on the barrel of the gun.  Appellant's DNA profile was also matched to that of blood found inside Flores's home the day his body was discovered.

**Defense Case**

Appellant testified that in August 2012, he had known Flores for about a year.  On August 12, 2012, appellant climbed over the wall into Flores' backyard to ask Flores if he wanted to buy a gun.  When appellant saw that Ortiz was also in the backyard, he asked Flores for some oranges instead.  Flores and appellant walked to the back of a shed where appellant told Flores that he had a gun for sale.  Flores told appellant to return later.

Later the same evening, appellant went to the wall and called to Flores.  When Flores did not respond, appellant went over the wall and knocked on the door to Flores's house.  Flores answered the door and appellant told him that he had brought the gun for Flores to look at.  Appellant told Flores that he wanted $400 for the gun.  The gun was not loaded when appellant went to Flores's house, but appellant put the magazine into the gun before handing it to Flores to show Flores that the clip fit into the gun.  Flores took the gun from appellant and told appellant that he did not have the money.  Flores then slid back the "slider," and said, "Well, it's . . . my f-in' gun now, and I'm not gonna pay you,"

4

and aimed the gun at appellant's chest. Flores appeared to be drunk. Appellant was "standing in the doorway" and Flores was holding the gun about three feet away. Appellant felt "stuck" and "trapped" and did not feel like he could leave. Appellant thought he would be shot if he ran. Appellant then swung at Flores, striking him in the "mouth area" while he tried to get hold of the gun. As appellant grabbed the gun with one hand and tried to push Flores away with the other hand, the gun went off. Flores was on the ground on his knees when the gun went off, with appellant bending over him. Appellant and Flores each had a hand on the gun when it went off. Appellant was not sure if he was the one who pulled the trigger. Appellant did not shoot the gun intentionally, and he did not kill Flores in self-defense. It was an accident.

After the gun fired, appellant ran out of Flores's house taking the gun with him. He returned to his own house, where he grabbed his backpack, got on his motorcycle, and drove to his shop. Appellant stayed at the shop for a while, thinking about what had happened. Appellant then decided to leave in his truck. After driving the truck out of the gate, appellant realized that he had left his backpack inside the shop, so he left the truck parked outside and went back inside. When he returned to his truck, it was across the street. Appellant encountered the security guard from the storage yard. Appellant did not recall crashing his truck into the gate, and thought the security guard had taken it. As appellant was trying to drive away, the police arrived and an altercation ensued between him and the officers.

**Rebuttal Evidence**

On August 20, 2012, a detective interviewed appellant, and the recorded interview was played for the jury. Appellant said the last time he had been to Flores's property was a week or two before his arrest. He denied going over there around the time of his arrest.

Flores's sister testified that Flores had several "health problems," including a hernia and liver problems. He was "weak" and "couldn't do a lot of things, like carry heavy stuff." He had been out of work as a truck driver for two years at the time of his death.

5

# DISCUSSION[3]

## I. No Error in Not Giving Lesser Included Manslaughter Instructions

While the trial court instructed the jury on first and second degree murder, voluntary manslaughter based on imperfect self-defense, and justifiable homicide, appellant contends the trial court nevertheless erred and violated his constitutional rights by failing to sua sponte instruct the jury on the lesser included offenses of (1) involuntary manslaughter, based on a theory that he acted without malice in the commission of either (a) misdemeanor brandishing of a firearm or (b) the felony of possession of a firearm by a felon, and (2) voluntary manslaughter based on a heat of passion theory.

### A. *Applicable Law*

In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Moye* (2009) 47 Cal.4th 537, 548.) Thus, a trial court must generally instruct the jury on a lesser included offense whenever substantial evidence warrants the instruction. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) Substantial evidence is evidence from which a jury composed of reasonable persons could find that the lesser offense, but not the greater, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Where no evidence supports a finding that the offense was anything less than the crime charged, a trial court need not instruct the jury on a lesser included offense. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) Voluntary and involuntary manslaughter are lesser included offenses to murder. (*People v. Gutierrez* (2002) 28 Cal.4th 1083,1145; *People v. Breverman, supra,* 19 Cal.4th at pp. 188–189.)

Failure to instruct on a lesser included offense is an error of California law alone, and thus subject only to state standards of reversibility. Therefore, failure to so instruct "is not subject to reversal unless an examination of the entire records establishes a

---

[3]     We note that regarding most of appellant's arguments on appeal, his trial counsel either did not raise the issue below or make objections sufficient to preserve the issue for appeal. Rather than finding appellant has forfeited his contentions and waiting for another day to resolve the issue of ineffective assistance of counsel, we instead address the merits of appellant's arguments.

reasonable probability that the error affected the outcome." (*People v. Breverman, supra,* 19 Cal.4th at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Where the jury resolves the factual issue of malice against the defendant under properly given instructions, any erroneous failure to instruct on the lesser included offense of manslaughter is not prejudicial. (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

### B. *Involuntary Manslaughter*

While murder "is the unlawful killing of a human being, or a fetus, with malice aforethought" (§ 187), manslaughter "is the unlawful killing of a human being without malice" (§ 192). Involuntary manslaughter is statutorily defined to include a killing which occurs "in the commission of an unlawful act, not amounting to [a] felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Additionally, "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82.)

### 1. *Misdemeanor Brandishing*

The misdemeanor of brandishing a firearm is committed when a person, "except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel." (§ 417, subd. (a)(2).) "The thrust of the offense is to deter the public exhibition of weapons in a context of potentially volatile confrontations." (*People v. McKinzie* (1986) 179 Cal.App.3d 789, 794.)

The evidence here does not support the finding that appellant was brandishing the gun. According to appellant, he merely showed the gun to Flores and then loaded it to show that it was working. There was no testimony that he did so in a rude, angry, or threatening manner. Appellant testified that Flores took the gun, said it was now his, and pointed it at appellant. Relying on appellant's version of the facts, it was Flores who, in fact, was brandishing the gun.

7

In any event, the evidence does not support the finding that appellant acted without malice. The jury was instructed with CALJIC No. 8.11 that malice is implied when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life. Instead of telling Flores to keep the gun or running out of the doorway he was standing in, appellant punched Flores in the mouth, then grabbed the gun and fired it while standing over Flores. Appellant's conduct in standing over Flores with a loaded gun pointed at Flores's head is highly dangerous and exhibits a conscious disregard for life. "In order to find defendant guilty of only involuntary manslaughter, the jury would have had to conclude *both* that the shooting was accidental and that defendant had acted without malice." (*People v. Thomas* (2012) 53 Cal.4th 771, 815.) The evidence presented does not support such findings.

## 2. Felon in Possession of Firearm

Appellant argues that because the jury found him guilty of possession of a firearm by a felon, the trial court should have instructed the jury on involuntary manslaughter based on this noninherently dangerous felony.

Once again, the evidence does not support the giving of this instruction. Even assuming for purposes of an involuntary manslaughter instruction that possession of a firearm by a felon is a noninherently dangerous felony, there is no causal connection between appellant's simple possession of the firearm and Flores's death. The evidence presented at trial showed that it was not appellant's *possession* of the gun that caused Flores's death, but his *use* of the gun–firing it at Flores–that resulted in Flores's death.

## 3. Harmless Error

Any error in failing to give the lesser included involuntary manslaughter instructions was harmless. The amended information alleged that appellant personally and intentionally discharged the firearm that caused Flores's death, within the meaning of section 12022.53, subdivision (d). The jury found the allegation to be true. The jury was instructed with CALJIC No. 17.19.5 that "intentionally and personally discharged [a] firearm," means "the defendant himself must have intentionally discharged it." By

8

finding the allegation true, the jury necessarily rejected appellant's claim that the gun went off accidentally. "[R]egardless of the manner an act of involuntary manslaughter is committed, the killing *must* be unintentional." (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556.) Based on the evidence presented here, it is not reasonably probable that the jury would have convicted appellant of only the lesser offense if instructions on involuntary manslaughter had been given.

### C. Voluntary Manslaughter

When a defendant kills in a sudden quarrel or under a heat of passion, the element of malice is negated and the offense may be reduced to voluntary manslaughter. (*People v. Moye, supra,* 47 Cal.4th at p. 549.) A heat of passion theory of manslaughter has both an objective and a subjective component. (*Ibid*.) To satisfy the objective, or "reasonable person" element, the defendant's heat of passion must be due to "'"sufficient provocation."'" (*People v. Gutierrez, supra,* 28 Cal.4th at pp. 1143–1144.) The provocation must be caused by the victim, or must be reasonably believed by the defendant to have been engaged in by the victim. (*In re Thomas C.* (1986) 183 Cal.App.3d 786, 798.) The provocative conduct may be either physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Moye*, *supra*, at p. 550.)

To satisfy the subjective element of voluntary manslaughter by heat of passion, the defendant must have killed while under the actual influence of a strong passion induced by sufficient provocation. (*People v. Wickersham* (1982) 32 Cal.3d 307, 326–327.) "'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]'" (*People v. Moye, supra*, 47 Cal.4th at p. 550.)

There was no substantial evidence here that appellant killed Flores under a subjective heat of passion. Appellant testified that he felt "stuck" and "trapped" when

9

Flores pointed the gun at him. Appellant initially reacted by punching Flores in the mouth. Appellant testified that he then attempted to wrestle the gun away from Flores, and the gun discharged accidentally during their struggle for the gun. Even under appellant's version of events, there was no evidence that when the gun actually discharged, appellant was so overcome by such strong emotion that he was acting rashly or impulsively and without deliberation. Rather, appellant explained that he was trying to take the gun away from Flores, and that the gun accidentally went off. "[N]o principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point—the defendant's own testimony—was to the contrary." (*People v. Moye, supra*, 47 Cal.4th at p. 554.)

Any error in failing to instruct the jury on heat of passion voluntary manslaughter was harmless. The jury was directed to examine appellant's mental state in the instructions on perfect and imperfect self-defense. "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence." (*People v. Moye, supra,* 47 Cal.4th at p. 557.) Under the circumstances here, it is not reasonably probable that appellant would have obtained a more favorable result at trial had a heat of passion instruction been given.

## II. No Error in Self-Defense Instructions

Appellant contends the trial court erred and violated his constitutional rights in giving the jury various self-defense instructions because they were either inapplicable to the facts of this case or an incorrect statement of the law.

Specifically, appellant argues that CALJIC Nos. 5.52, 5.53, 5.54, and 5.55[4] were inapplicable to the facts of this case because "[t]here was no evidence from which it could be inferred that appellant was the initial aggressor, nor that appellant continued to use force against Flores after danger ceased to exist, nor that appellant either contrived his self-defense nor wrongfully created circumstances which justified his adversary's use of force." We disagree.

The evidence showed that appellant climbed over a wall into Flores's yard without permission and then was told by Flores not to do that again (in front of Ortiz). Flores's reprimand could have given appellant a motive to retaliate. After all, later that same night, appellant went to Flores's house with a loaded gun and ultimately shot Flores. From this evidence, the jury could have reasonably inferred that appellant was the initial aggressor, and rejected appellant's testimony that he went to Flores's house with the intent to sell a gun, which would have rendered CALJIC No. 5.54 (self-defense by an

---

[4]     The jury was instructed as follows:

"CALJIC [No.] 5.52.  SELF-DEFENSE—WHEN DANGER CEASES  [¶]  The right to self-defense exists only as long as the real or apparent threatened danger continues to exist.  When the danger ceases to appear to exist, the right to use force in self-defense ends.

"CALJIC [No.] 5.53.  SELF-DEFENSE NOT AN EXCUSE AFTER ADVERSARY DISABLED  [¶]  The right of self-defense ends when there is no longer any apparent danger of further violence on the part of an assailant.  Thus where a person is attacked under circumstances which justify the exercise of the right of self-defense, and thereafter the person uses enough force upon his attacker as to render the attacker incapable of inflicting further injuries, the right to use force in self-defense ends.

"CALJIC [No.] 5.54.  SELF-DEFENSE BY AN AGGRESSOR  [¶]  The right of self-defense is only available to a person who initiated an assault, if [h]e has done all the following:  [¶]  A. He has actually tried, in good faith, to refuse to continue fighting;  [¶] B. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and,  [¶]  C. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he has stopped fighting.  [¶]  After he has done these three things, he has the right to self-defense if his opponent continues to fight.

"CALJIC [No.] 5.55.  PLEA OF SELF-DEFENSE MAY NOT BE CONTRIVED [¶]  The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

aggressor) applicable. From this same evidence, the jury could have also reasonably believed that appellant went to Flores's house with the loaded gun seeking to instigate a violent encounter, hoping to "create a real or apparent necessity of exercising self-defense." Thus, CALJIC No. 5.55 (plea of self-defense may not be contrived) was supported by the evidence.

Even if the jury believed appellant's testimony that he went to Flores's house to sell a gun, the remaining challenged instructions were also still applicable. The jury could have believed this testimony, as well as the testimony that a struggle ensued over control of the gun, yet still rejected appellant's testimony that the gun went off accidentally. Indeed, appellant's behavior following the shooting demonstrated consciousness of guilt—he did not check on Flores's well being or call 911, he fled the scene taking the gun with him, and he lied to the police and denied going to Flores's house. These actions were inconsistent with an accidental firing, and instead suggested that appellant had sole control of the gun and fired it intentionally. To the extent the jury found that appellant, at one point in time, believed in the necessity to defend against imminent peril to life or great bodily injury, CALJIC Nos. 5.52 (self-defense—when danger ceases) and 5.53 (self-defense not an excuse after adversary disabled) were applicable.

In any event, any error in giving the instructions was harmless. When a trial court errs by giving a legally correct instruction that has no application to the facts of the case, the error is, once again, an error of state law only. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Thus, reversal is required only if it is reasonably probable the result would have been more favorable to the defendant absent the error. (*Id*. at p. 1130.) Jurors are capable of analyzing the evidence and reaching a rational conclusion that will save them from relying on a factually inadequate theory. (*Id*. at p. 1131.) The jury was instructed pursuant to CALJIC No. 17.31 that not all instructions were necessarily applicable, and to disregard any instructions that applied to facts determined not to exist. Jurors are presumed to follow the trial court's instructions. (*People v. Homick* (2012) 55 Cal.4th

816, 866–867.)  To the extent the jury found no evidence supporting the challenged instructions, it would have disregarded them.

Appellant also argues that the second to last paragraph of CALJIC No. 5.17 was given in error, because it deprived him of the defense of imperfect self-defense.[5] Appellant argues that the language—"*this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit*"—is an incorrect statement of the law, fails to designate under what conditions the adversary's use of force is "legally justified," and suggests that any unlawful or wrongful conduct would in fact "legally justify" the use of force by the victim. According to appellant, his "wrongdoing" as a felon who possessed and tried to sell a firearm would cancel the availability of imperfect self-defense.

In *In re Christian S.* (1994) 7 Cal.4th 768, our Supreme Court concluded that the doctrine of imperfect self-defense had not been abrogated by the Legislature when the Legislature eliminated the diminished capacity defense.  (*Id.* at pp. 774, 783.)  Keeping in line with its belief that the doctrine should nevertheless be narrowly construed (*id.* at

---

[5]     The jury was instructed as follows:

"CALJIC [No.] 5.17.  ACTUAL BUT UNREASONABLE BELIEF IN NECISSITY TO DEFEND—MANSLAUGHTER

"A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

"As used in this instruction, an 'imminent' peril means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

"*However, this principle is not available, and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit.*

"This principle applies equally to a person who kills in purported self-defense." (Italics added).

13

p. 783), the Court pointed out: "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense" (*id*. at p. 773, fn. 1).

CALJIC No. 5.17, as given to the jury here, embodies the Supreme Court's definition of the doctrine of imperfect self-defense. It is therefore not an incorrect statement of the law.

Further, appellant's argument that the instruction is misleading and ambiguous—because it fails to designate under what conditions the adversary's use of force is legally justified and suggests that any type of "wrongful conduct" vitiates the theory of imperfect self-defense—is not well taken. The challenged portion of CALJIC No. 5.17 specifies that the unlawful or wrongful conduct must be such that would *legally justify* the adversary's use of force. The jury was instructed with CALJIC No. 5.12 that self-defense "is justifiable and not unlawful" when a person reasonably believes he or she is in imminent danger of death or great bodily injury. Viewing CALJIC No. 5.17 in the context of the other instructions, it becomes apparent that the unlawful or wrongful conduct which would legally justify an adversary's use of force would be conduct which caused the adversary to reasonably believe he or she was in imminent danger of death or great bodily injury.

### III. No Prejudicial Prosecutorial or Judicial Misconduct

Appellant contends that both the prosecutor and the trial court committed misconduct by characterizing the killing as a "murder" during questioning. We do not find the conduct prejudicial.

14

When the prosecutor was cross-examining appellant at trial, the subject of appellant's girlfriend, Oralia, leaving him was addressed. In particular, the prosecutor explored both the timing of her departure and the reasons for her leaving:

"Q [BY THE PROSECUTOR]: Isn't it true, [appellant], that before Oralia left you that you had an argument with her, . . . [?]

"A I don't remember, but I think so.

"Q Okay. And isn't it true that you told her about your plans to get a gun?

"A Yes.

"Q And she wasn't happy about that?

"A Yes.

"Q And that was the day that she left, on August—the day before August 12, 2012, correct?

"A I don't remember what day we spoke about that.

"Q But she left the day before?

"A She left, yes.

"Q Being August 11, 2012?

"A I'm not sure what day, but she left.

"[THE COURT]: Was it the day before the murder?

"[APPELLANT]: Yes.

"[THE COURT]: Okay."

The prosecutor subsequently called Irma Rico (the victim's sister), as a rebuttal witness:

"Q And when is the last time that you spoke to [your brother]?

"A The Sunday before he was murdered.

"Q The Sunday before he was murdered or the Sunday—the day that he was murdered? Do you know?

"A Sunday, that Sunday, the Sunday. [¶] . . . [¶]

"Q Okay. And do you remember the last time you saw him?

"A A week ago before he was murdered."

15

In questioning a witness at a criminal trial, a prosecutor should not refer to a killing as a "murder" in advance of a jury making such a finding. (*People v. Johnson* (1951) 105 Cal.App.2d 478, 491.) The same rule would logically extend to questions posed by a trial court. We agree with the People, however, that while premature, the brief references to "murder" in this case did not cause any prejudice. (*People v. Price* (1991) 1 Cal.4th 324, 479–480 [no prejudice when prosecution witness referred to killing as "murder," and, in response to defense objection, prosecutor argued this was the only possible characterization for the killing; prosecutor's comment was premature, but no evidence killing was self-defense or manslaughter].)

When viewed in context, the challenged questions were related to timing as opposed to any attempt to establish that a murder was in fact committed. Moreover, several jury instructions minimized any potential harm. For example, the jury was instructed that "statements made by the attorneys during the trial are not evidence"; not to "assume to be true any insinuation suggested by a question asked a witness"; and a "question is not evidence." (CALJIC Nos. 0.50 & 1.02.) The trial court also instructed the jury: "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion." (CALJIC No. 17.30.) Jurors are presumed to understand and comply with instructions. (*People v. Homick, supra*, 55 Cal.4th at pp. 866–867.)

Additionally, during closing argument, defense counsel emphasized that it was up to the jury to determine whether appellant was guilty of murder: "They keep using the term 'murder.' However, you are the arbiters. And by arbiters, it's a fancy word. That means you determine. [¶] You are the judges of the facts, and you decide whether this is murder. Is this manslaughter? Is it self-defense? Was this an accident? You, all 12, will decide, based on what you've heard and what's been presented to you as to what actually happened, and you all have to agree whether or not certain elements have been made as to each step you go through."

16

In sum, based on the jury instructions given, as well as the above portion of defense counsel's closing argument, the premature references to "murder" in questions posed to witnesses by the prosecutor and the trial court did not result in prejudice.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT

17