Filed 2/17/15  P. v. Lopez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048759 |
| v. | (Super. Ct. No. 10NF4137) |
| RAFAEL LOPEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Robin Urbanski, and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

Exactly one week before Christmas 2010, an intoxicated Rafael Lopez killed high school senior Douglas Uselton (Douglas) and his father, Steven Uselton (Steven), in a high-speed car collision as the Useltons drove to a school competition. A jury convicted Lopez of two counts of second degree murder, and the trial court sentenced him to 30 years to life in prison.

On appeal, Lopez argues insufficient evidence supports his convictions, the trial court erred in instructing the jury, the court erred in admitting evidence, the court erred in denying his motion for mistrial, his defense counsel provided deficient prejudicial performance, and there was cumulative prejudicial error. None of his contentions have merit, and we affirm the judgment.

FACTS

Seventeen-year-old Douglas, a student at Oxford Academy, prepared to go to a speech and debate tournament early Saturday morning. About 5:30 a.m., Douglas and his father, 44-year-old Steven, left the house; it had been raining that night. As Steven drove through a nearby intersection, 18-year-old Lopez, who was under the influence of alcohol and marijuana, ran a red light at a high rate of speed and struck the Useltons' car. Lopez did not apply the brakes before colliding with Douglas's side of the vehicle. Douglas and Steven were pronounced dead at the scene.

Officer Angel Ramirez arrived at the scene about 5:35 a.m. The cars were "signifigant[ly]" damaged, and the Useltons' car was on the front lawn of a nearby house. Ramirez went to Lopez's car; the driver's side window was down. Lopez's eyes were bloodshot and watery, and he appeared confused. Ramirez asked Lopez, who was leaning back, if he was okay and Lopez mumbled and slurred his speech. As firemen tried to get Lopez out of the car, he sat up and tried to start the car. When Lopez was out of the car, he stumbled but said he was okay. Paramedics put Lopez on a gurney and took him to the hospital. Officer Roger Plumlee, the lead investigator, arrived at the scene at 5:45 a.m.

2

At the hospital, registered nurse Nicole Nielsen took Lopez's blood about 6:51 a.m. He was confused, his speech was slurred, he smelled of alcohol, and he had a cut on his face.

Officer James Rice conducted a field sobriety test of Lopez at about 7:30 a.m. Lopez had bloodshot and watery eyes, and his speech was extremely slurred. Lopez reeked of alcohol. When Rice asked Lopez whether he had been drinking, Lopez first answered he did not believe so and then answered he does not drink. Rice said he smelled alcohol coming from him, and Lopez again denied drinking. When Rice asked Lopez if he had smoked marijuana, Lopez said he had not. When asked, Lopez said he had not taken any medications. Lopez said he was not in any pain and was not injured, despite the fact he had a large bandage on his head. During the evaluation, Lopez fell asleep and Rice was unable to wake him up. Based on his evaluation, including a horizontal gaze nystagmus exam, Rice opined Lopez was under the influence of alcohol.

Plumlee arrived at the hospital about 11:00 a.m. and saw Lopez asleep. Rice told Plumlee they had difficulty waking up Lopez and keeping him awake. When Lopez woke up, Plumlee tried speaking with him but he was disoriented and his eyes were bloodshot and watery. He still smelled of alcohol.

Around noon, Lopez was released from the hospital. It took hospital staff several attempts to wake up Lopez. Rice asked Lopez about the collision, but he could not remember. Lopez thought he was driving near his home.

Plumlee interviewed Lopez at the police station early that afternoon. Plumlee advised Lopez of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Lopez said he did not remember the collision and did not remember where he was coming from or where he was going. Lopez said he drank about five beers and smoked marijuana but "[he] was driving pretty good." When Plumlee asked him whether it was okay to drink and drive, Lopez answered, "No. I shouldn't have done it." After Lopez said he went to Anaheim High School, the following colloquy occurred:

3

"[Plumlee]:  Did they ever have a program there -- did they ever have a program there called Every 15-Minutes at Anaheim High School?

"[Lopez]:  (Inaudible) little skits.

"[Plumlee]:  And what's that skit about?

"[Lopez]:  About (Inaudible) [when you drink and drive].

"[Plumlee]:  Did you see that?

"[Lopez]:   Yeah.

"[Plumlee]:  How many times did you see that?

"[Lopez]:  (Inaudible) [I think I saw it] just once in the gym.

"[Plumlee]:  In the gym?

"[Lopez]:  Yeah (Inaudible).

"[Plumlee]:  So your school brought out actors and the crash cars and reenacted?

"[Lopez]:  (Inaudible) [Students] crash cars.

"[Plumlee]:  How did you feel when you saw that?

"[Lopez]:  It was shocking.

"[Plumlee]:  It was shocking.  Why?

"[Lopez]:  'Cause [*sic*] people just lose their life (Inaudible) [right and left].

"[Plumlee]:  Yeah?  So after seeing something like that, how do you feel about drinking and driving?

"[Lopez]:  I feel (Inaudible) [shouldn't have tried it].

"[Plumlee]:  (Inaudible) do you think it's wrong to drink and drive?

"[Lopez]:  Yeah."[1]

---

[1]    The colloquy includes five instances of bracketed language.  The bracketed language is handwritten, not typed, on the transcript of the interview.  Lopez does not dispute the transcript is an accurate reflection of his interview.

4

Plumlee asked Lopez whether in hindsight he was okay to drive. Lopez replied, "No, I shouldn't have done it. I should have listened to (Inaudible)." Plumlee asked whether someone offered to drive. Lopez answered, "I'm pretty sure everybody offered to drive." When Plumlee told Lopez the collision killed two people, Lopez asked if the two people were in his car. Later when Plumlee repeated two people were dead, Lopez asked if they were intoxicated. A little later, Lopez asked Plumlee, "Do you think they are going to make it?" Plumlee repeated they were dead. A little later the following colloquy occurred:

"[Lopez]: (Inaudible) Will I be able contact [*sic*] probation[?]

"[Plumlee]: I don't -- you won't be able to get a hold of -- I'll probably be in contact with your probation officer.

"[Lopez]: (Inaudible)

"[Plumlee]: Huh?

"[Lopez]: (Inaudible)

"[Plumlee]: Yeah. I'll be in contact with probation, just probably not -- there's nothing that they can do for you now. If she wants to get in touch with you, she will. Let's finish the booking process and you're right now being charged with, like I said, suspicion of vehicular manslaughter times two and driving under the influence of alcohol. And we're gonna [*sic*] continue our investigation. Do you have any other questions?"

Lopez said that two days before the collision he took 13 Vicodin pills and drove his car. He added that his car cannot go over 120 miles per hour because his car has a governor; he tried it once.

Plumlee subsequently obtained video surveillance footage of the intersection where the collision occurred from a nearby gas station. The video showed Lopez had a stale red, which meant the light had been red for some time. The speed limit for Steven was 40, and the speed limit for Lopez was 40 or 45.

5

Two days later, Plumlee tried to interview Lopez a second time. After Plumlee advised Lopez of his *Miranda* rights, Lopez requested an attorney. As Plumlee prepared to leave the room, Lopez asked him about the crash. Plumlee sat down and told Lopez that if he wanted to talk he had to waive his *Miranda* rights. Lopez waived his rights, and the interview began. Plumlee told Lopez the video surveillance showed him running the red light at a high rate of speed. Lopez did not remember the details of the collision. Lopez said he dropped some friends off in Long Beach. He explained he did not drink in Long Beach because he was already intoxicated when he dropped them off. He said, "I wasn't drinking in Long Beach. I was drinking the whole time, 'cause [*sic*] I wasn't even gonna [*sic*] drive (Inaudible)." When Plumlee asked him whether he drank in the car, he said, "I was (Inaudible) able to drive like (Inaudible) other time when I was on the freeway, I just stayed in the carpool the whole time." Lopez said after he left his friend's house he got someone to buy him beer at a liquor store and he drank in a nearby alley. Lopez stated he was driving around and saw people outside a house and he stopped. He said he drank beer and smoked marijuana and left the party about 1:00 a.m. Lopez could not explain where he was from the time he left the party to the time of the collision but said he needed to go home to go to work, although he was driving away from his house. Lopez repeated he drove intoxicated the day before the collision.

Forensic testing later revealed Lopez's blood-alcohol level was .138 when his blood was taken at 6:51 a.m. His blood-alcohol level would have been .15 or .16 at 5:30 a.m., the time of the collision. Forensic testing later revealed Lopez had four nanograms per milliliter of blood of "THC" and 14 nanograms per milliliter of blood of "THCA."

Accident reconstruction evidence established Steven was driving about 37 miles per hour and Lopez was driving about 82 miles per hour in a straight line. It also demonstrated Lopez did not apply his brakes. Instead, the evidence established Lopez was using the manual transmission, accelerated into the collision, and was

controlling his vehicle. Lopez's vehicle, a vehicle commonly used in rally racing, had a governor that limited its speed to 120 miles per hour.

An amended information charged Lopez with two counts of murder (Pen. Code, § 187, subd. (a), all further statutory references are to the Penal Code, unless otherwise indicated). Before trial, the prosecutor filed a trial brief. As relevant here, the prosecutor moved to admit evidence Lopez suffered a prior nighttime collision to establish his knowledge—he knew driving too fast at night was dangerous. The prosecutor also filed a brief requesting the trial court prohibit defense counsel from referring to or arguing for any uncharged or "'lesser'" offenses. The prosecutor stated he was proceeding based solely on the charge of murder and the jury would not be instructed on any other offenses. The prosecutor requested the court prohibit counsel from arguing Lopez was guilty of a lesser offense.

At a pretrial hearing, the prosecutor argued evidence Lopez was in a prior collision was relevant to the knowledge element. Defense counsel objected on the grounds evidence Lopez was in a prior collision was not relevant because the collision was not similar to the collision here and no one was injured. The prosecutor again asserted the evidence was relevant on the issue of knowledge—"You drive too fast, you're going to crash." The trial court's tentative decision was the evidence was relevant to the knowledge element of implied malice and its relevance outweighed any prejudicial effect. Based on the prosecutor's representation it would require no more than two witnesses, the court ruled the evidence would not require an undue consumption of time and it would not confuse the jury. The next day, the court ruled the evidence was admissible not only to the issue of Lopez's knowledge but also to the issue of whether Lopez acted with a conscious disregard of human life.

At trial, Desiree Uselton, Steven's wife and Douglas's mother, testified concerning the circumstances preceding their death. Plumlee testified at various points throughout the trial concerning the various stages of the investigation. He testified

7

concerning the interviews, including some portions that were difficult to hear because of the type of recorder he was wearing. Both of Lopez's interviews with Plumlee were played for the jury; transcripts were provided to the jury and later admitted into evidence.

Plumlee also testified regarding his interview of Lopez's father, Samuel Lopez (Samuel), at the hospital. After detailing what Samuel told him regarding his suspicion Lopez had previously drank his beer at home, the prosecutor inquired whether Samuel spoke with Lopez about marijuana use. Samuel told Plumlee they discussed marijuana "quite often" because Samuel was opposed to it but Lopez enjoyed smoking it. Plumlee continued, "[Samuel] believed that his son was not smoking marijuana any more due to the fact that he was on probation." Defense counsel objected on Evidence Code section 352 grounds and moved to strike the answer.

The trial court met with counsel in chambers. Defense counsel moved for a mistrial. The prosecutor asserted the court should strike the answer and admonish the jury. Counsel responded they had a "pregnant pause" that left the jury with nothing to ponder except Lopez's probation status and a limiting instruction was insufficient to cure the prejudice. The court stated the jury did not know why Lopez was on probation, and the court instructed the prosecutor to tell Plumlee not to mention it again. The court ruled it would strike the testimony, admonish the jury, and ask each juror individually whether they could follow the instruction. The court concluded it could cure the prejudice with an admonition.

When proceedings resumed, the trial court stated the following: "Ladies and Gentleman, that last answer that this witness gave is stricken in its entirety. You're not to consider that last answer. It was in the context of marijuana. Okay. That -- not that I'm striking that part. I'm striking the whole answer. The whole answer is stricken. And you're ordered not to consider it. All right." When the court asked each juror whether he/she could follow the court's instruction, each juror answered affirmatively.

8

When questioning resumed, Plumlee testified concerning Samuel's conversations with Lopez about marijuana use. Samuel also told Plumlee that he spoke with Lopez about the dangers of smoking marijuana. Samuel said Lopez told him that he likes to smoke marijuana, and when Samuel commented the drug can make you lose control, Lopez replied, "Yeah, I know. I know."

On cross-examination, Plumlee admitted he initiated the discussion with Lopez concerning the "Every 15 Minutes" program. Plumlee stated he facilitated and participated in the Every 15 Minutes program at Buena Park High School. A little later, defense counsel asked for a sidebar discussion.

In chambers while discussing an unrelated issue, the topic of the interviews and the transcripts ensued. Defense counsel repeatedly said he had an opportunity to review the transcripts and make redactions. Counsel stated he "inadvertently" left in the information about Lopez's probation status. Counsel said the "onus is on me" a couple times. When cross-examination resumed, Plumlee explained that during the first interview he mentioned manslaughter based on the evidence he had at the time.

Kari Sterling, a forensic scientist, testified for the prosecution concerning alcohol and marijuana impairment. She testified concerning the effects of alcohol on driving, including "complete risk-taking," delayed reaction times, and fine motor control impairment. She also testified concerning the effects of marijuana on driving, including difficulty with divided attention tasks, difficulty paying attention, delayed reaction times, and impaired vision. She also testified concerning the synergistic effect of alcohol and marijuana, meaning their combined effect is greater than their effect separately.

Samuel testified for the prosecution. Samuel admitted he found marijuana in his home about six months before the collision and he told Lopez about the harmful effects of drugs. He added that on one occasion he noticed a couple beers missing and believed it was Lopez who took them. Samuel stated he spoke with Lopez about safety

9

and that he should be more responsible "with the car and with the family" because a tire was flat. Samuel did not think Lopez was a responsible driver.

Maria Gamboa testified for the prosecution regarding the Every 15 Minutes program. Gamboa testified she was a history teacher at Anaheim High School. She stated she was the coordinator of the Every 15 Minutes program. She stated the program educates high school students about drinking and driving and its consequences, including that statistically someone dies every 15 minutes in the United States as a result of an alcohol-related traffic incident. She said the program is a two-day event, offered every other year, and is targeted to Juniors and Seniors but everyone is aware of the program.

Gamboa described the program as follows: "The day of the actual event the entire student body is aware of some type of accident occurring on campus, and the bell rings every 15 minutes. The grim reaper, a police officer, walk[s] around campus. We display pictures. We have a coffin. Everyone is exposed. We do the body print on the ground outside of the classroom where the student has perished. [¶] Again every 15 minutes as the students move around the campus, [all students] they're exposed to that. And they ask questions, and the teachers are supposed to tell the students what -- what is going on on the campus, whether the underclassmen do or not, the upperclassmen come out to the accident, come out the next day to funeral assembly, so they're more aware and a participant of it." She added there are two vehicles that are brought onto campus and police officers close part of the street and fire department personnel use the jaws of life to replicate an alcohol-related accident. She said the mood on the school is somber, and she agreed the goal of the program is to save lives.

On cross-examination, Gamboa stated she educated herself about the Every 15 Minutes program from information distributed by the California Highway Patrol. She coordinates with the City of Anaheim, the Anaheim Police Department, and the Anaheim Fire Department to conduct the program. She said the program was conducted in April 2010. She described the program further: "Every 15 minutes the bell will ring, and the

10

grim reaper approaches a student, whether they're in class or out of class, and a police officer will read an obituary, and then that student is taken away, and they change into -- they're kind of [in] mummy form. They get a T-shirt and get their makeup done. And that happens every 15 minutes until after school." She stated that after the participating students get their T-shirt and have their makeup done, they go back to class. "And so they walk around campus, but they don't talk. They don't participate. The teachers don't call on them, but they're there listening to their lectures. A picture of them is put outside the classroom door. Their obituary is put outside the classroom door, and then they lay on the floor. They do like the body trace, so that as people are walking by, they know someone perished there, and then the students will stop and read and look at the picture."

Before the prosecutor offered evidence pursuant to Evidence Code section 1101, subdivision (b), the trial court raised the issue of a limiting instruction. When defense counsel tried to reargue the admissibility of evidence Lopez suffered a prior collision, the prosecutor reminded the court they had litigated the issue and the court had ruled. The court agreed the issue was solely whether to give the jury a limiting instruction and defense counsel agreed to prepare one. Before presentation of the evidence, the trial court instructed the jury it could consider Antonio Jimenez's and Jeremy Viscusi's testimony on the issue of whether Lopez knew driving too fast was dangerous to human life and not to conclude he was a person of bad character.

Jimenez testified that in June 2009, he was a passenger in a car Lopez drove at night on a curved street when Lopez lost control and hit the guardrail. When the prosecutor asked Jimenez whether he told police Lopez was driving too fast, he was generally nonresponsive. He acknowledged the police report indicated that was what he said. On cross-examination, Jimenez testified Lopez was not going fast and was not driving recklessly. On redirect examination, the prosecutor impeached his witness with a February 2010, residential burglary conviction.

11

Viscusi, a police officer, testified the guardrail was bent. He said Jimenez told him Lopez was driving "'way to fast[,]'" about 35 miles per hour, and lost control and hit the guardrail. He said there was moderate damage to the car, it probably could not be driven. He cited Lopez for excessive speed, because it was a 15 mile per hour zone, and for driving without a license. On cross-examination, Viscusi testified Lopez did not appear to have been drinking.

Veronica Thomas, a psychologist, testified for the defense. Thomas stated she interviewed Lopez on two occasions, in April and May 2011, and she reviewed all the relevant reports. She concluded Lopez was of average intelligence and he did not suffer from psychosis, mental illness, or a communication or learning disorder. Thomas explained though that the frontal lobe of the brain does not completely develop until a person's early to mid-20s. She opined Lopez, like many adolescents, suffered from a failure of judgment, insight, and ability to analyze data. On cross-examination, Thomas testified Lopez knew the difference between right and wrong, but on occasion he disregarded that. She agreed he had a significant history of poor judgment. On redirect examination, defense counsel stated: "And you kind of danced around it, but these aspects of poor judgment as a juvenile, [Lopez] pled guilty to residential burglary. Right?" Thomas answered, "Yes." Thomas said Lopez was "emotionally and intellectually immature." On recross-examination, she agreed Lopez was "egocentric and selfish and just do[esn't] care about the harm [he's] causing others."

After the close of evidence, the trial court reviewed the jury instructions with counsel, asking counsel to object to any instruction they disagreed with. Defense counsel did not object to CALCRIM No. 520, the murder instruction that discussed implied malice. When discussing the instruction on voluntary intoxication, the trial court stated counsel had previously discussed the instruction and agreed to modifications. Defense counsel agreed with the modifications.

12

As relevant here, the trial court instructed the jury with the following: (1) CALCRIM No. 520, First or Second Degree Murder with Malice Aforethought; and (2) Special Instruction No. 1, Voluntary Intoxication Resulting in Unconsciousness.

CALCRIM No. 520 provided as follows: "The defendant is charged in [c]ounts 1 and 2 with murder. [¶] To prove that the defendant is guilty of this crime, the [p]eople must prove that: 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express malice* if he unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death, and the death would not have happened without the act. A *substantial factor* is more than a trivial or remote factor. It must actually contribute to the death. However, it does not need to be the only factor that causes the death. [¶] If you find the defendant guilty of murder, it is murder of the second degree."

13

Special Instruction No. 1 stated as follows: "Unconsciousness caused by voluntary intoxication is not a defense to the charged crimes and does not relieve the defendant of responsibility for the crimes. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug or substance knowing that it could produce an intoxicating effect." The trial court did not instruct the jury on any lesser included/related offenses. The court also instructed the jury with CALCRIM No. 220, Reasonable Doubt.

The jury convicted Lopez of two counts of second degree murder. The trial court sentenced Lopez to two consecutive terms of 15 years to life for a total prison term of 30 years to life. Lopez appealed.

DISCUSSION

*I. Sufficiency of the Evidence*

Lopez argues insufficient evidence supports his second degree murder convictions. We disagree.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice is implied when the circumstances of the killing show it was done with an "abandoned and malignant heart." (§ 188.) Implied malice requires that the defendant act with a wanton disregard of the high probability of death. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1246.) The facts must demonstrate the defendant had a subjective awareness of the risk. (*People v. Watson* (1981) 30 Cal.3d 290, 298

14

(*Watson*).)  Although section 29.4 (former § 22) has been interpreted to prohibit admission of evidence of voluntary intoxication to negate implied malice, that section does not relieve the prosecution from its burden of proving every element of charged crime beyond a reasonable doubt.  (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1114.)

California courts have long recognized that a traffic fatality caused by a grossly intoxicated motorist may support a conviction for second degree murder. (*Watson, supra,* 30 Cal.3d at pp. 300-301; see *People v. Autry* (1995) 37 Cal.App.4th 351, 358, and cases cited therein.)  "'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental facilities with a vehicle capable of great force and speed, reasonably may be held to exhibit conscious disregard of the safety of others.'"  (*Watson, supra,* 30 Cal.3d at pp. 300-301.)

"[C]ourts have identified factors relevant for upholding a murder conviction based on drunk driving:  '(1) a blood-alcohol level above the .08 percent legal limit; (2) a pre-drinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.'  [Citation.]"  (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1114 (*Batchelor*).)  Here, there was sufficient evidence supporting all these factors.

First, the evidence established that at the time of the collision, Lopez's blood-alcohol level was .15 or .16, twice the legal limit and at a level which impaired his ability to drive.  The evidence also established he was under the influence of marijuana. Expert testimony illustrated the ways in which alcohol and marijuana can effect driving, including risk taking and delayed reaction times.  Expert testimony also established the synergistic effect of alcohol and marijuana, meaning risk taking was increased and reaction times were decreased.  Rice, immediately after the collision, and then Plumlee over five hours later at the hospital, both smelled alcohol emanating from Lopez, and

15

both thought he was intoxicated. Thus, there was overwhelming evidence Lopez drove while under the influence of intoxicants.

Second, there was sufficient evidence of Lopez's predrinking plan to drive. Although during his second interview Lopez told Plumlee he was drinking the whole time because he was not going to drive, his actions that night compel the contrary conclusion. It is unclear from the record whether Lopez started drinking before or after he dropped off his friend in Long Beach. What is clear, however, is that immediately after he dropped off his friend, he found a liquor store, convinced someone to buy him beer, and drank it in a nearby alley. It is undisputed that at this time Lopez was alone in his car. He cannot credibly claim he did not plan to drink and drive. Not satisfied with his intoxication level, Lopez drove around Long Beach looking for a party. When he found one, a party where he did not know anyone, he drank more and smoked marijuana. Lopez told Plumlee that when he decided to leave the party to go home, "everybody offered to drive." Yet, Lopez got into his car and drove, and at the time he collided with the Useltons, he was alone driving away from his home. Additionally, Lopez made other statements to Plumlee supporting the conclusion Lopez had no qualms about driving under the influence of alcohol or pain medications. Lopez's conduct of driving to a liquor store and then to a party where he knew no one both support the conclusion he "'must have known that he would have to drive'" after drinking. (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973 ["[s]ince appellant was driving alone at 4 a.m., it is a reasonable inference that when he 'left' wherever he had been drinking, his car was available and he had intended to drive it"].) Therefore, there was sufficient evidence Lopez drank and smoked marijuana intending to drive later.

Third, there was sufficient evidence Lopez knew of the dangers while driving intoxicated. During his first interview with Plumlee just hours after the collision, Lopez admitted to Plumlee drinking and driving was wrong and he said he should not have tried it. When asked, Lopez also stated he participated in the Every 15 Minutes

16

program at his high school.  The evidence demonstrated the program's purpose was to educate high school students about the dangers of drinking and driving through accident reenactments involving high school students as the participants.  When Plumlee questioned Lopez about his attendance at the program, Lopez said the program was "shocking" because "people just lose their life (Inaudible) [right and left]."

In addition, during his second interview when Plumlee asked Lopez whether he was drinking in the car, he answered, "I was (Inaudible) able to drive like (Inaudible) other time when I was on the freeway, I just stayed in the [carpool] the whole time."  This evidence tended to establish Lopez was no stranger to driving while intoxicated.  In fact, there was a method to his madness—he simply drove in the carpool lane to avoid the consequences he knew could result from drinking and driving.  Lopez's statements concerning his knowledge about the dangers of drunk driving refute his claim the manner of his driving, i.e., controlled, straight, and accelerating, demonstrate he was not aware of the risk.  Based on Lopez's statements to Plumlee about his participation in the Every 15 Minutes alcohol education program and what he learned there about the dangers of driving while intoxicated, the jury could reasonably conclude Lopez knew there was a high probability of causing death when driving under the influence.  Thus, there was sufficient evidence Lopez knew driving under the influence of intoxicants created a high probability of causing death.

Fourth, there was overwhelming evidence Lopez drove in a highly dangerous manner.  The evidence established it had been raining that night and Samuel warned his son to drive carefully.  But as is often the case, the son did not listen to his father.  Lopez drove his vehicle, which the accident reconstruction expert described as a rally racing car, almost double the 45 miles per hour speed limit just hours after it had rained.  And as Lopez approached the intersection he engaged the manual transmission and accelerated into the intersection traveling about 82 miles per hour through a red light when his vehicle collided with the Useltons' car.  The force of the collision knocked the

17

car onto the front yard of a nearby house. Needless to say, this was indisputable evidence Lopez drove his vehicle in an extremely dangerous manner and "'exhibit[ed] a conscious disregard of the safety of others.'" (*Watson, supra,* 30 Cal.3d at p. 301.)

Lopez argues the following: (1) there was insufficient evidence he was conscious at the time he was driving; (2) evidence he previously attended the Every 15 Minutes program was insufficient to establish he knew driving under the influence is an act that has a high probability of causing death and that at the time he drove he was aware of what he learned in the Every 15 Minutes program; (3) the circumstances in *Watson, supra,* 30 Cal.3d 290, concerning awareness of the risk compel the conclusion here that he was not aware of the risk of harm he created; and (4) evidence of his prior bad driving was insufficient to establish implied malice.

Lopez's first claim, that he was unconscious, is essentially his attempt to argue voluntary intoxication was a defense to his conduct. But we know voluntary intoxication is not a defense to implied malice second degree murder (§ 29.4; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1374-1375 [in murder case voluntary intoxication inadmissible to negate implied malice]), the theory of the prosecutor's case here. Even were this a viable claim, it is meritless. The majority of the evidence Lopez relies on to support his claim is postcollision evidence. Of course he would be incoherent and confused after the impact of from a high-speed car collision. The precollision evidence established Lopez was in control of his car, drove in a straight line, activated the manual transmission, and accelerated though the intersection.

With respect to his second claim, above we explain how evidence Lopez attended the Every 15 Minutes program combined with other evidence established he was aware of the risk of driving while under the influence. Lopez's quibbling with the statistical accuracy of whether someone dies as a result of a drunk driver every 15 minutes or every 53 minutes, and his reference to the probability of side effects from the flu vaccination are meritless. The dangers of driving under the influence is best

18

illustrated by the California Legislature's severe punishment for repeat offenders. (*People v. McCarnes* (1986) 179 Cal.App.3d 525, 534, citing former Veh. Code, §§ 23165, 23170, 23175; see Veh. Code, § 23217.) Additionally, his assertion he was unaware of what he learned at the Every 15 Minutes program when he drove that night is unpersuasive and not supported by the evidence. If a lapse in time between an alcohol education program and the accident were a factor, courts would not routinely rely on court mandated alcohol education programs as a factor in implied malice analysis. We know that is not the case. (*Batchelor, supra,* 229 Cal.App.4th at p. 1115.) And the evidence establishes he was aware of what he learned at the Every 15 Minutes program because he answered Plumlee's questions about the program after the collision. Unfortunately for the Uselton family, the program did not have the desired effect with respect to Lopez.

As to his third claim, the fact the *Watson* court concluded the knowledge element was satisfied based on the fact defendant nearly missed another car and applied the brakes does not establish Lopez was not aware of the risk because those factors are not present here. Lopez's comparison of evidence offered against him with evidence offered in *Watson* is of little help because sufficiency of the evidence issues "necessarily calls for analysis of the unique facts and inferences present in each case." (*People v. Rundle* (2008) 43 Cal.4th 76, 137, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1010 [that different or stronger evidence offered in other cases considering the issue does not establish evidence was insufficient here as each case must be considered on own facts].) As we explain above though there were other facts establishing Lopez was aware of the risk of his dangerous driving, namely, his statements to Plumlee, his participation in the Every 15 Minutes program, and his other driving escapades.

Finally, as we explain below, evidence of Lopez's prior poor driving was relevant to the issue of his knowledge driving too fast was dangerous to human life. The

19

trial court instructed the jury on the proper, and improper, use of that evidence. Based on a review of the record most favorable to the judgment, we conclude there was sufficient evidence Lopez exhibited a conscious disregard of others when he drove his car at a high rate of speed while under the influence of intoxicants and collided with the Useltons, killing Douglas and Steven. Thus, there was sufficient evidence supporting Lopez's conviction for implied malice second degree murder.

*II. Jury Instructions*

*A. Involuntary Manslaughter*

Lopez contends the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter because there was evidence he did not intend to drive when he drank and he was "unconscious[]" when he drove. Statutory and decisional authority require we reject his contention.

Section 29.4, subdivision (b), formerly section 22, provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, *when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought*." (Italics added.)

In *People v. Carlson* (2011) 200 Cal.App.4th 695, 699, 706 (*Carlson*), a case decided by a different panel of this court, defendant argued the trial court erred in refusing to instruct the jury with CALCRIM No. 626, which states voluntary intoxication resulting in unconsciousness can reduce a murder charge to involuntary intoxication, because "she 'drank knowing that she would not be driving.'" After explaining insufficient evidence supported giving such an instruction, the court explained the Legislature's 1995 amendments to section 22 barred her claim. (*Carlson, supra,* 200 Cal.App.4th at pp. 703-705.) The court stated cases have interpreted the 1995 amendments "'to preclude evidence of voluntary intoxication to negate implied malice

. . . .'" The court added California Supreme Court dicta suggests a person could be convicted of second degree murder even when voluntary intoxication resulted in "'actual unconsciousness.'" (*Id.* at p. 706; *People v. Boyer* (2006) 38 Cal.4th 412, 469, fn. 40.) In response to defendant's claim there was evidence she did not intend to drive, the court explained: "The problem . . . is that it is based on the premise voluntary intoxication can still negate a finding of implied malice. In *Turk*, the appellate court declared: 'It is no longer proper to instruct a jury . . . that "when a defendant, as a result of voluntary intoxication, kills another human being without premeditation and deliberation and/or without intent to kill (i.e., without express malice), the resultant crime is involuntary manslaughter." This instruction is incorrect because a defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice, which voluntary intoxication [now] cannot negate . . . . To the extent that a defendant who is voluntarily intoxicated unlawfully kills with implied malice, the defendant would be guilty of second degree murder.' [Citation.] No reason exists to carve out an exception where a person drinks so much as to render him or her unconscious." (*Carlson, supra,* 200 Cal.App.4th at p. 707.) We find *Carlson* persuasive.

In addition to the fact there was insufficient evidence to support giving such an instruction—because there was evidence Lopez intended to drive, despite his claim to Plumlee otherwise, and because there was evidence he was conscious of his actions, he controlled his vehicle, engaged the manual transmission, and accelerated through the intersection—section 29.4, subdivision (b), and the cases that have interpreted it foreclose his claim. Lopez cannot rely on his unconsciousness caused by voluntary intoxication as a defense to implied malice second degree murder. Lopez's complaint the court's failure to instruct the jury on involuntary manslaughter based on voluntary intoxication lowered the prosecutor's burden of proof is equally unpersuasive. The trial court properly instructed the jury the prosecution had to prove each element of implied malice beyond a reasonable doubt. (CALCRIM No. 220.) Had the jury concluded the prosecutor failed

21

its burden, it could have acquitted Lopez. Lopez's complaint appears aimed as much at the prosecutor's exercise of its charging discretion as it is directed at the trial court's instructions.

Additionally, crimes committed "in the driving of a vehicle" are expressly excluded from the definition of involuntary manslaughter. (§ 192, subd. (b).) Thus, the trial court did not err in failing to instruct the jury on involuntary manslaughter.

B. *Voluntary Intoxication*

Lopez asserts the trial court erred in instructing the jury it could not consider his lack of consciousness resulting from voluntary intoxication as to implied malice, specifically whether he acted with a conscious disregard for the safety of others, because it lowered the prosecution's burden of proof. The court in *Carlson, supra,* 200 Cal.App.4th 695, rejected the identical claim, and we again find *Carlson* instructive.

After discussing the holding in *Montana v. Egelhoff* (1996) 518 U.S. 37 (*Egelhoff*) [plurality decision rejecting due process challenge to state law barring evidence of voluntary intoxication to establish absence of required mental state], the *Carlson* court stated California courts have followed *Egelhoff* and rejected due process attacks on former section 22. (*Carlson, supra,* 200 Cal.App.4th at pp. 707-708; see *People v. Timms* (2007) 151 Cal.App.4th 1292, 1300; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1117.) These cases stand for the proposition the Legislature's 1995 amendments to section 22 represent its determination that for public policy reasons evidence of voluntary intoxication is strictly limited. Here, the trial court did not err in instructing the jury, "Unconsciousness caused by voluntary intoxication is not a defense to the charged crimes and does not relieve the defendant of responsibility for the crimes."

Based on section 29.4, *Egelhoff*, *Carlson*, *Timms*, and *Martin*, the fact the jury could not consider Lopez's unconsciousness as a result of his voluntary intoxication did not relieve the prosecution from establishing beyond a reasonable doubt all the

elements of implied malice. Thus, the prosecution's burden of proof was not lessened, and Lopez's due process rights were not violated.

## C. Conflicting Instructions

Lopez argues the jury instructions conflicted in three ways. We will address each in turn. We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

## 1. Deliberately v. No Deliberation Required

Lopez contends CALCRIM No. 520 is internally inconsistent because it states that to prove implied malice, the prosecution must prove the defendant "deliberately acted with conscious disregard for human life," but later states malice aforethought "does not require deliberation." This language does not conflict.

First degree murder requires premeditation and deliberation but second degree murder does not. (*In re Thomas C.* (1986) 183 Cal.App.3d 786, 796-797 (*Thomas C.*).) Both first and second degree murder require malice aforethought. (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1393.) A deliberate action with a conscious disregard for human life can support a finding of implied malice. (*Watson, supra,* 30 Cal.3d at p. 298.) Thus, second degree implied malice murder requires a deliberate act but it does not require deliberation. (*Thomas C., supra,* 183 Cal.App.3d at p. 796.) CALCRIM No. 520 therefore correctly instructed the jury that an element of implied malice is "deliberate[]" action with conscious disregard for human life but that malice aforethought does not require "deliberation or the passage of any particular period of time." (*People v. Knoller* (2007) 41 Cal.4th 139, 152 [approving standard jury instructions definition of implied malice].) Based on a review of the instructions as a whole, we conclude these are different legal concepts and the jury would know the difference between a deliberate act and deliberation in the context of a passage of time (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1246 [presume jurors intelligent capable of understanding instructions]).

23

*2. Conscious Disregard v. Unconsciousness*

Lopez asserts the trial court erred in instructing the jury with CALCRIM No. 520 that implied malice required as relevant here the prosecutor to prove "[h]e deliberately acted with conscious disregard for human life" but then instructing the jury with Special Instruction No. 1 that "[u]nconsciousness caused by voluntary intoxication is not a defense to the charged crimes and does not relieve the defendant of responsibility for the crimes." We disagree.

As we explain above, a conscious disregard for human life means the defendant was aware of the dangerous consequences of his conduct and willfully chose to ignore its potential for injury. The unconsciousness instruction, an instruction defense counsel approved, told the jury it could still convict Lopez of second degree implied malice murder even if his voluntary intoxication resulted in unconsciousness. Read together, the instructions informed the jury unconsciousness due to voluntary intoxication does not negate evidence Lopez acted with a conscious disregard for human life, an element of implied malice. As we explain above, this is a correct statement of the law. (*Carlson, supra,* 200 Cal.App.4th at pp. 707-708.) Contrary to Lopez's claim, which is essentially the same as his claim above concerning Special Instruction No. 1, this did not lower the prosecution's burden of proof. Thus, these instructions did not conflict.

*3. Knowing Dangerousness v. Unconsciousness*

Lopez argues the trial court erred in instructing the jury with CALCRIM No. 520 that implied malice required as relevant here the prosecutor to prove that "[a]t the time he acted, he knew his act was dangerous to human life[,]" but then instructing the jury with Special Instruction No. 1 that "[u]nconsciousness caused by voluntary intoxication is not a defense to the charged crimes and does not relieve the defendant of responsibility for the crimes." Again, we disagree.

Lopez attacks the knowing dangerousness element of implied malice in the same manner as he attacks the conscious disregard element. His argument fails for the

24

same reason.  Read together, the instructions informed the jury unconsciousness due to voluntary intoxication does not negate evidence Lopez knew his conduct was dangerous to human life when he drove.  Again, this is a correct statement of the law.  (*Carlson, supra,* 200 Cal.App.4th at pp. 707-708.)  The instructions did not conflict, and the prosecution's burden of proof was not lowered.  Because we conclude Lopez's jury instruction claims are meritless, we need not discuss his contentions he was prejudiced by the instructional errors.

III.  *Evidence Code Section 1101, Subdivision (b)*

Lopez contends the trial court erred in admitting evidence he suffered a prior collision because it did not tend to establish driving too fast was a risk to human life.  We disagree.

Evidence of uncharged acts is generally inadmissible to prove criminal disposition.  (Evid. Code, § 1101, subd. (a); *People v. Kipp* (1998) 18 Cal.4th 349, 369.)  However, Evidence Code section 1101, subdivision (b), allows the trial court to admit "evidence that a person committed a crime . . . or other act when relevant to prove some fact (such as . . . intent, . . . [or] knowledge . . .) other than his or her disposition to commit such an act."  Although other acts evidence might be relevant to prove a material fact other than a defendant's criminal disposition, this evidence is subject to exclusion pursuant to Evidence Code section 352, for among other reasons undue prejudice, an undue consumption of time, or confusing the jury.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)  We review a trial court's evidentiary rulings for an abuse of discretion.  (*People v. Valdez* (2004) 32 Cal.4th 73, 108.)

Here, the trial court did not abuse its discretion in admitting evidence Lopez drove at an unsafe speed and collided with a guardrail.  Although there was no evidence Lopez was under the influence of any substances and no one was injured, that evidence was relevant because it tended to establish Lopez was aware of and knew driving too fast is dangerous.  (Evid. Code, § 210 [relevant evidence is evidence that has

25

any tendency to prove a material disputed fact]; *People v. Freeman* (1994) 8 Cal.4th 450, 491 [evidence relevant no matter how weak if it tends to prove issue before the jury].)

As the court stated in *People v. Ortiz* (2003) 109 Cal.App.4th 104, 116, "The real danger presented by drunk driving . . . is not intoxication itself, but its conduciveness to recklessness and the significant public threat the *latter* conduct presents. . . . In other words, at least for the analytical purposes underlying the admissibility issue under [Evidence Code] section 1101[, subdivision] (b), it does not matter whether alcohol or other inebriates are involved in the uncharged misconduct or whether it is caused by something else." The fact there was no evidence Lopez was intoxicated and no one was injured when Lopez drove too fast and collided with the guardrail is immaterial for purposes of the evidence's admissibility. That evidence tended to establish Lopez's knowledge regarding the perils of reckless driving. Thus, the evidence was relevant to the issue of Lopez's knowledge, an element of implied malice.

Additionally, the trial court properly weighed the evidence's probative value against any prejudice and concluded it was not unduly prejudicial because the nature of the evidence would not inflame the jury against Lopez. In making its ruling, the court also properly considered the additional time to present the evidence, no more than two witnesses, and concluded the evidence would not consume an undue amount of time or confuse the jury. Thus, the court properly exercised its discretion in concluding evidence Lopez suffered a prior collision was relevant and admissible, and his evidentiary and constitutional arguments are meritless. Because we conclude the court properly admitted the evidence, we need not address Lopez's claim he was prejudiced by admission of the evidence.

IV. *Motion for Mistrial*

Lopez asserts the trial court erred in denying his mistrial motion after Plumlee testified Lopez was on probation because the evidence was "so prejudicial" the court's admonition did not cure the harm. Not so.

26

"A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with *considerable discretion* in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 573, italics added (*Avila*).) Although it is difficult to analogize to other cases because of the speculative nature of assessing prejudice within the context of the facts of the case, we find *Avila* instructive.

In that case, a witness testified, "'Keep cool. Keep—kick back, because—don't do nothin', 'cause [defendant] barely got out of prison. And he's crazy. He'll kill you.'" (*Avila, supra,* 38 Cal.4th at p. 572.) The California Supreme Court ruled any prejudice was cured by the trial court's admonition to the jury not to consider evidence defendant was in prison. (*Id*. at p. 574.)

Plumlee's statement here was not as egregious as the witness's statement in *Avila*, which the Supreme Court concluded was cured by the trial court's admonition. Any prejudice flowing from Plumlee's brief, isolated statement concerning Lopez's probation status was cured by the trial court's admonition to the jury. (*People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [witness reference to parole brief and insignificant in context of entire guilt trial].) The court took the added step and polled each juror individually to ensure she/he could follow the court's instructions. Additionally, evidence Lopez was on probation without more was of no assistance to the jury in determining whether Lopez acted with implied malice. Contrary to Lopez's claim otherwise, his credibility was not at issue, his state of mind at the time of the collision was the critical issue at trial. (See *People v. Allen* (1978) 77 Cal.App.3d 924, 935

27

[defendant's parole status prejudicial where close case and critical issue turned on defendant's credibility].)

Neither the delay before the trial court admonished the jury nor the subsequent break alter our conclusion the court's admonition cured any prejudice. Thomas's *subsequent* testimony Lopez suffered a residential burglary conviction similarly does not alter our conclusion the court *previously* exercised its discretion in a proper manner. Thus, the trial court did not abuse its considerable discretion by concluding an admonition was sufficient to cure any prejudice stemming from Plumlee's reference to Lopez being on probation. Lopez's federal constitutional rights were not violated.

## V. *Ineffective Assistance of Counsel*

Lopez argues his defense counsel was ineffective for failing to redact from the transcript of his December 18, 2010, interview with police the fact he was on probation. We need not determine whether Lopez's defense counsel provided deficient performance because Lopez was not prejudiced.

To prevail on an ineffective assistance of counsel claim, appellant "must prove "'that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant."' [Citation.] "'A reasonable probability is a probability sufficient to undermine confidence in the outcome."' [Citation.] If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient. [Citations.]" (*In re Crew* (2011) 52 Cal.4th 126, 150.)

Here, Lopez was not prejudiced because it was not reasonably probable he would have received a more favorable result had defense counsel redacted his probationary status from the interview transcript. As we explain above more fully, the

28

evidence Lopez acted with implied malice was strong. The evidence established that at the time of the collision Lopez was under the influence of alcohol and marijuana. His blood-alcohol level was twice the legal limit. Although Lopez claimed he never intended to drive, his actions portray a different picture. After dropping off friends in Long Beach, he drove to a liquor store where he acquired beer and drank it before driving to a party where he did not know anyone. There he drank more and smoked marijuana. Despite the fact people offered to drive, Lopez ignored them and drove while under the influence.

The record includes evidence from which the jury could reasonably conclude Lopez knew of the dangers of driving under the influence. Lopez's statements to Plumlee establish he was aware it was wrong and he should not have drove in his condition. Lopez's participation in the Every 15 Minutes alcohol education program demonstrates he was aware there was a high probability of causing death when drinking and driving because he told Plumlee the program made him aware people die "right and left" from drunk driving. Moreover, there was other evidence this was not Lopez's first time driving under the influence and he devised a method to do so safely. Finally, the evidence demonstrated Lopez drove in an extremely dangerous manner just hours after it had rained. Lopez drove his car over 80 miles per hour, engaged the manual transmission, and accelerated though the intersection before colliding with the Useltons' car. From this evidence, the jury could certainly conclude Lopez drove his car in a manner exhibiting a conscious disregard for others. The fact the jury heard evidence Lopez was on probation did not sway the jury in the prosecutor's favor in relation to this strong evidence of implied malice.

VI. *Cumulative Error*

Lopez contends the cumulative prejudicial effect of the errors requires reversal. We have concluded there were no instructional or evidentiary errors. Additionally, we have concluded Lopez was not prejudiced by evidence he was on

29

probation.  Thus, Lopez's argument the cumulative prejudicial effect of the errors requires reversal is meritless.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.